## Ferguson v. Gregory.

(Decided November 9, 1926.)

### Appeal from Graves Circuit Court.

1. Elections.—Contentions, which, if correct, would not change the result of the primary election being contested, will not be considered.

2. Elections.—Contestant, seeking recount for fraud or mistake in certificates of election returns, must establish that ballots have been so preserved as to be best evidence.

3. Elections—Denial of Motion for Recount and for Authority to Introduce Evidence to Show Proper Preservation of Ballots did Not Deprive Contestant of Taking Evidence to Show Such.—Contestant need not have incorporated into his motion for recount motion for authority to introduce evidence to show that ballots had been so preserved as to be best evidence of vote and was not deprived of taking evidence thereon by denial of motion.

4. Evidence.—It is common knowledge that 10-cent padlocks offer little resistance to being opened either with or without keys and that keys for them may be obtained without difficulty.

5. Elections.—Evidence held to sustain refusal to recount ballots on ground that evidence to show they had been so preserved as to be best evidence of vote was insufficient.

6. Elections.—Voters of precincts will not be disfranchised because evidence did not authorize recount of ballots and stub books, and precinct returns were stolen after board of election commissioners had canvassed and certified result of election.

7. Elections—If Statute Does Not Declare Acts Essential to Validity of Election They are Mandatory if They do, and Directory if They do Not, Affect its Merits.—If statute does not declare acts provided for to be essential to validity of election, they are mandatory if they affect actual merits of election, and are necessary to purity of elections, but directory if otherwise.

8. Elections—Statute, Requiring Election Officers to Mark Opposite Name of Each Person on Registration Book "Voted' or "Not Voted" as Case May be, Held Directory Merely (Kentucky Statutes, Section 1502).—Kentucky Statutes, section 1502, providing that in certain places election officers shall mark opposite name of each voter on the registration book the word "voted" or "not voted" as the case may be, held to be directory merely and noncompliance with it not to invalidate vote, in view of sections 1475, 1550-19, 1550-28.

9. Elections—Judgment will be Affirmed where Evidence Shows at Most Fraud in Certifying Election Returns which, if Eliminated, would Not Affect Result.—Where giving greatest probative value to evidence of fraud it would show only that election officers certified that contestee received more votes than were cast for him, and this could be eliminated, and result of election still ascertained to be as found by lower court, judgment will be affirmed; legal votes being unaffected.

WILLIAM HENDERSON, JOHN LOVETT, H. H. LOVETT, JAMES ALLENSWORTH and M. C. ANDERSON for appellant.

ROBBINS & SMITH, W. J. WEBB, HOLIFIELD, GARDNER & McDONALD and AUBREY HESTER for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Affirming.

At the primary election held August 7, 1926, the Democrats of the first congressional district of Kentucky voted to nominate their candidate for Congress. Appellant, Garth K. Ferguson, and appellee, W. V. Gregory, were candidates for that nomination. By the official count appellee was shown to have received 184 more votes than appellant did and was awarded the certificate of nomination. Appellant thereupon instituted this contest under the provisions of section 1550-28, Kentucky Statutes. Appellee's answer traversed the grounds of

contest and alleged grounds of counter-contest. The issues were made, and upon the trial in the circuit court of the contest it was adjudged that appellant had established that 10 votes counted, canvassed and certified for contestee were illegal and should be deducted from the total number of votes certified as having been received by him; and on the counter-contest it was adjudged that contestee had established that 89 votes counted, canvassed and certified for contestant were illegal and should be deducted from the total number of votes certified as having been received by him; and that at the election in question contestee received 263 more votes than contestant did, and was therefore nominated as the Democratic candidate for Congress for the district named. Contestant prosecutes this appeal from that judgment, and it presents numerous questions as will be indicated.

Appellant by the contest sought to have it adjudged that he rather than appellee had been nominated by charging that the officers of election at certain precincts of the district had by fraud or mistake certified that appellee had received more votes than were cast for him, and that appellant had received less than were cast for him; and by charging that illegal voters were permitted to vote who voted for appellee, and that legal voters voted in an illegal manner for appellee, all of which were counted and were among the votes certified as having been cast for appellee. The counter-contest was based upon the same grounds as to certain other precincts of the district. It appears that as appellant's cause is presented by the appeal, with reference to individual illegal votes and voters, if the utmost he claims under his attack upon the judgment of the trial court with reference to them be conceded to him, it would not result in upsetting the majority of the votes adjudged to have been received by contestee. That may be made to appear by merely stating the particulars in which appellant complains of the judgment below as it relates to individual illegal votes and voters.

In response to the sustained motion to make his petition and grounds of contest more specific, by amended petition appellant charged that there were on the registration book for precinct No. 1 of ward 2 of the city of Mayfield the names of 530 voters registered as legal Democratic voters of that precinct; that of the number 33, whose names were given, had moved from the pre-

cinct before the primary, 48 whose names were given, did not vote, 11, whose names were given, had died, and 2, whose names were given, were registered twice, and 28, whose names were given, were illegal voters who voted there. Appellant concedes that on the evidence herein as to the votes and voters specified in his amended petition, the trial court correctly determined that 28 of those registered who lived in the precinct did not vote; that 29 of those registered had moved from the precinct; that 8 of those registered had died before the election; and that 3 illegal voters were permitted to vote for appellee. It appears that, in addition to the evidence as to the voters named and specified by appellant's amended petition, he took the depositions of a number of other persons, which he claims establish that, though they were among the 530 registered Democratic voters of that precinct, they did not vote in the primary election. After taking those depositions contestant offered to file another amended petition specifying the names of those persons as residents of the district who did not vote. Contestee objected and the trial court, upon the theory that it set up a new cause of contest too late, sustained the objection. Contestee moved to strike the depositions of 71 of those witnesses from the record, which the trial court sustained over appellant's objection. Appellant complains of that action of the trial court. Assuming, without deciding, that the trial court should have permitted the amendment to be filed and should have considered the testimony of the additional 71 witnesses, and assuming that their evidence establishes that all of them were among the registered Democratic voters of the precinct in question, and, though legally qualified to, did not vote at the election in question, would result in only this change in the judgment of the trial court. At the election in that precinct, as certified by the election officers and as canvassed and certified by the county board of election commissioners, Gregory received 479 votes, Ferguson 12, and Green, another candidate, 4, a total of 495. If we add to the 65 voters whose names are included among the 530 total registered voters of the precinct, who were shown by the evidence and considered not to have voted, the 71 voters, assumed to be shown by the evidence which the trial court rejected not to have voted, we have a total of 136 persons among those carried on the registration rolls of the precinct who did not vote at the election. Deducting that number from 530 there is left 394

legally qualified voters in the precinct who are not shown by the evidence herein not to have voted. Twelve votes were cast for Ferguson and four for Green. Deducting those 16 votes from the 394, 378 legally qualified voters are left in the precinct to have voted for Gregory, and there is no evidence in the record tending in the least to establish that they did not do so. Deduct the three votes that were cast for him, shown to have been illegal, and there are left 375 votes that, so far as this record discloses, were legally cast for contestee and should be counted for him. It was certified that in that precinct he received 469 votes. Assuming that ballots in excess of 375 were cast for contestee and that all of them were illegal, so far as the question is affected by appellant's contention that the trial court erred in not permitting his amended answer to be filed, and in striking from the record the depositions of the 71 additional witnesses, and granting him the utmost that he contends for, would result in striking only 94 votes from the total certified as having been received by contestee at the precinct in question, instead of 13 as the trial court did. Strike the difference, 81, from contestee's adjudged majority of 263, and he is left with a majority of 182.

By appellant's amended petition filed in response to the sustained motion to make his grounds of contest more specific, he alleged that the certificate of election returns from Pilot Oak precinct in Graves county certified that only 82 ballots were cast at the election; but that it also certified that contestee received 99 votes and contestant 3, and charged that thereby the election officers of that precinct fraudulently certified that contestee received 20 more votes than were cast for him; that the certificate of returns from Lynnville precinct in that county certified that 138 ballots were cast; but also certified that contestee received 107 votes, that contestant received 35 votes, and that Green, another candidate, received 6 votes; and charged that thereby contestee was fraudulently or by mistake certified to have received 10 more votes than were cast for him; and that the certificate of returns from West Folsomdale certified that 75 ballots were voted; that contestee received 55 votes, that Green, the other candidate, received 5, and that contestant was certified to have received only 7 votes, and charged that thereby by fraud or mistake upon the part of the officers of election, he was certified to have re-

ceived 8 votes less than were actually cast for him. The trial court sustained contestee's motion to strike those allegations from the amended petition upon the ground that it set up new cause of contest too late. Assuming, but not deciding, that the trial court erred in so doing, and assuming that the evidence establishes that contestant was entitled to have the 38 votes so involved deducted from contestee's majority, that number taken from 182 left above leaves contestee with a majority of 144.

The trial court upon the counter-contest deducted 19 illegal votes from the total number of votes received by contestant in Trigg county. Contestant complains that 15 of the number were erroneously deducted. He insists that by contestee's counter-contest the charge was made that a number of illegal voters whose names were given were permitted to vote who voted and whose votes were counted for contestant at North Roaring Springs precinct in that county. He concedes that the evidence for contestee establishes that 15 of the persons named were not legally qualified to but were permitted to vote and that they voted for him, but he insists that the evidence establishes that they voted at South Roaring Springs precinct instead of North Roaring Springs precinct as charged by contestee's counter-contest. Assuming, but not deciding, that appellant's contention is well founded, those 15 votes deducted from contestee's majority of 144 left above leaves him yet with a majority of 129.

Appellant insists that the trial court erred in not sustaining the exceptions to the depositions of all of the witnesses whose depositions were taken for contestee in Cairo, Illinois. Those depositions were taken by contestee in his counter-contest in an attempt to establish that residents of the state of Illinois came over to Kentucky and voted for contestant in Ballard county. The votes of 24 persons were deducted by the trial court from the total number received by contestant in Ballard county, and the judgment gives the names of each of them and the precinct at which he voted. We find that only 4 of the 24 votes of Ballard county held by the trial court to have been illegally cast for appellant were persons whose depositions were taken in Cairo, Illinois. Assuming that the trial court founded his judgment that they were illegal voters upon the evidence contained in their depositions, and assuming, without deciding, that the

trial court erred in not sustaining contestant's excep-
tions to those depositions would only result in deducting
4 votes from the majority of 129 left above, leaving con-
testee a majority of 125.

On contestee's counter-contest the trial court de-
ducted from the total number of votes received by con-
testant in Caldwell county 25 votes adjudged to have
been cast by voters for contestant who were not legally
qualified to vote at the election in question. Contestant
challenges the correctness of the judgment below as to 24
of those votes. It was adjudged that they were not le-
gally qualified to vote because the evidence discloses that
at the last preceding general election they had voted
against some or all of the nominees of the Democratic
party. That evidence was elicited from those witnesses
over their protest and over the objection and exception
of contestant. Section 1550-19, Kentucky Statutes, relat-
ing to qualifications of voters at a primary election, pre-
scribes that they shall possess all the qualifications of
voters at a regular election and in addition shall

> "be a member of the party for whose nominees he
> intends to cast his vote, and shall have affiliated with
> said party and supported its nominees, and no per-
> son shall be deemed to have affiliated with the party
> in whose primary he seems (seeks) to cast his vote,
> if he voted against the nominee or nominees of such
> party at the last general election."

Appellant contends, however, that it is unlawful
under our constitutional and statutory requirements as
to the secrecy of the ballot to compel one to disclose for
whom he voted at a preceding election. If, however, we
should assume, without so deciding, that the trial court
erroneously held that in a contest those participating in
a primary election can be compelled to testify that at
the last preceding general election they voted against
any of the nominees of the party, and that that fact ren-
ders illegal their votes in the party primary, it would re-
sult in deducting only 24 votes from contestee's major-
ity of 125 left above, and would leave him with a major-
ity of 101.

The trial court deducted from the total number of
votes received for contestant 14 votes cast for him in
Madrid Bend precinct of Fulton county. Appellant
complains of the action of the trial court as to a portion
of these. We find it difficult even to assume that the trial

court erred in deducting any of those votes. The evidence establishes that only seven voters appeared in person at the polls in that precinct. One of them was furnished ballots by the election officers for three relatives at home who found it inconvenient to attend and vote in person, all three of which, together with his own ballot, he voted for appellant, and they were counted and certified in the returns from that precinct. Three other voters who attended in person were furnished one additional ballot each which they voted for their wives who found it inconvenient to attend the election in person; and they were voted and counted for contestant and certified in the returns. The father of one of the election officers appeared in person to vote, and, without administering to him the oath required as to illiteracy or physical inability to vote, one of the election officers voted his ballot openly for him on the table. The election in that precinct was held in a schoolhouse; no booths had been provided; and no effort was made by the officers of the election to observe the constitutional and statutory requirements as to secrecy of the ballot. The evidence discloses that all of the ballots were cast by the voters on the table at which the clerk of the election sat and around which the other officers of the election were either sitting or standing. The 14 ballots so voted appear all to have been cast and counted and certified for appellant. In view of these facts it is difficult to assume that the trial court erred in rejecting the entire vote of that precinct. If we should do so, however, as to any of those votes, it would not serve to change the result.

The foregoing constitute all of appellant's contentions in so far as they relate to the votes of individual voters challenged either by the contest or counter-contest as being illegal, either for the reason that the voter was not qualified to participate in the nominating primary or that the ballot was illegally cast so as to render it invalid as a vote for either of the candidates. It having been determined that if we should assume appellant to be correct in all his contentions as to them, it would not serve to change the result of the nominating primary or to give appellant the relief sought by him herein, it necessarily follows that a determination of those questions is not involved in deciding the only question presented by this appeal, which is whether appellant, Ferguson, or appellee, Gregory, was nominated as the Democratic candi-

date for Congress in the first congressional district at the recent primary election. Hence we deem a mere statement of the questions to be sufficient.

Appellant earnestly insists that the trial court erred in overruling his motion to open the ballot boxes and recount the ballots cast in all of the voting precincts of Graves county. This court does not understand, as appellant insists, that the ruling of the trial court on his motion to that end deprived him of the right to produce evidence as to the manner in which the ballots had been preserved. Evidence as to the manner in which the ballots have been preserved is in exactly the same class as all other evidence essential to be produced by a contestant to establish his grounds of contest. Where the certificates of election returns of any precincts are attacked for fraud or mistake and contestant seeks a recount of the ballots to ascertain the result of the election, it is incumbent upon him to establish by proof that the ballots have been so preserved that they can be accepted as the best evidence of the number of votes cast for the contending candidates at the election. It was wholly unnecessary for contestant to incorporate into his motion to have the ballots recounted a motion for authority to introduce evidence on that question. The trial court first convened herein to hear the preliminary motions and make up the issues. At that time, apparently by agreement of the parties and in any event by order of the court to which no exceptions were taken, a great many special examiners were appointed to take the depositions herein; the time was fixed for contestant's proof to be taken; that for contestee's proof to be taken; and that for any evidence in rebuttal that might be desired by either party. Appellant took the deposition of the county court clerk as to the manner in which the ballots of the election in Graves county had been kept, and offered no other evidence on that question. He does not contend here that he did not take the deposition of any witness on that question which he might have taken but for the trial court's ruling in declining to open and count the ballots; and we are unable to sustain his contention that by the ruling he was deprived of taking any evidence on that question that he mght have desired to take.

Appellant insists that the trial court erroneously overruled his motion to recount the ballots in Graves county, and especially in the precincts within the city of

Mayfield, and more especially precinct 2, ward 1, therein, under the evidence in the record as to the manner in which they had been preserved. The rule obtaining in this jurisdiction as to the facts that must appear before a court hearing a contest may accept the ballots offered in evidence as the best evidence from which to ascertain the result of the contested election was written and fully discussed in the court's recent opinion in Hicks v. Kimbro, 210 Ky. 265. Without encumbering this opinion with a restatement of the rule and the reasons, we deem it sufficient merely to refer to that opinion and the previous opinions of the court therein cited. So far as this record discloses, at least nothing to the contrary appears, after the close of the polls on election day the election officers for their respective precincts in Graves county, Kentucky, complied with all the statutory requirements on the subject of stringing and sealing the ballots and in inclosing them within and sealing the envelopes and in delivering them contained in the ballot boxes to the county court clerk, locked as required. Not only were the ballots and ballot boxes so returned but the stub books containing the unused ballots so stamped and the certificates of returns from all of the precincts likewise were delivered to the county court clerk. The inspection required by the county court clerk and the two officers of the election delivering the ballot boxes was made; the boxes were relocked; receipts were given; and the election seal and keys to the locks on the boxes were delivered to the proper officers. The ballot boxes containing the ballots and all of the stub books from all of the precints appear to have been kept in the county court clerk's office until the meeting of the county board of election commissioners. They appear to have met at the proper time and to have duly canvassed and certified the vote of the county precinct by precinct from the official certificates appearing in the back of the stub books from each of the precincts. Late in the afternoon of the day on which the canvassing board finished its work and issued its certificates the ballot boxes containing the ballots and two additional boxes containing the stub books from all of the precincts of the county appear to have been taken by the county court clerk, with the assistance of the jailer, to a room in the basement of the courthouse and stored. The evidence discloses that the room in which the ballot boxes were stored and that in which the

two boxes containing the stub books were stored was accessible to anyone from without the courthouse through an opening wholly uncovered, used in conveying coal to the basement of the courthouse. The evidence discloses that between the time when the ballots and stub books were so placed in the basement of the courthouse and late Friday afternoon of August 13th, the date when representatives of contestant first sought to examine the stub books from the various precincts of Graves county, some person had entered the place where the ballots and stub books were stored and had unlawfully taken and carried away the box containing all of the stub books from the various precincts of the city of Mayfield; and though a reward of $250.00 was offered for their return no trace of them appears ever to have been found. No evidence found in the record tends in the least to establish who perpetrated this offence. The record establishes that before passing upon appellant's motion to recount the ballots the trial court in person examined the ballot boxes and the place where they were stored and the means of access to them through the open coal chute. The evidence discloses that the ballot boxes were locked with ten cent padlocks which, within common knowledge, offer but little resistance to one undertaking to open them either with or without keys, and keys for which may be obtained without difficulty. The evidence discloses that, due to failure upon the part of previous election officers to whom election seals had been delivered, as required by law, to return them after keeping them for the time required to the office of the county court clerk, a number of election seals for the county were outstanding. Before this election was held the county court clerk had to obtain a new supply of seals. In view of these facts and the opportunities thus appearing for unauthorized or interested persons to have gained access to the ballots, to have changed them as desired, and to have restrung and resealed them and the envelopes containing them with little chance of detection, the trial court concluded and so adjudged that the integrity of the ballots offered as evidence had not been sufficiently shown by the evidence and declined to recount them. The facts of this case on the question summarized above appear to offer stronger evidence that interested and unauthorized persons had had opportunity to change the ballots than appeared in the Hicks-Kimbro case, *supra.* Here, as in that case, they are shown to have had every opportunity

to do so with the minimum chance that the ballots themselves would show evidence of the fact that they had been changed; and in addition here the evidence establishes that some unauthorized and doubtless interested person actually did gain access to the place where the ballots and stub books from the election in question had been stored and unlawfully took and carried away a portion of the stub books. The court is constrained to hold that the trial court did not err in overruling appellant's motion to recount the ballots in the city of Mayfield and Graves county.

In connection with the question last above discussed, it is deemed by the court to be well to call attention to the provisions of section 1550-28, Kentucky Statutes, as they relate to the duties of this court upon hearing the appeal of a contest for a nomination under our primary election law. It is required that the party desiring to appeal shall on the same day the judgment is rendered in the circuit court execute a supersedeas bond as in other civil actions; the clerk of the circuit court shall immediately thereafter transmit to the clerk of this court the original papers in the contest, including transcript of evidence if the evidence was heard orally, or depositions if taken by deposition, or such part of them as may be furnished or as may be required by the court or by the parties; that when the record shall have been received by the clerk of this court he shall immediately deliver it to the Chief Justice; that the contest then shall have precedence over all other business and causes pending in this court; and shall be heard and disposed of as speedily as the exigencies of the case will admit. It is further provided that upon the trial of the contest here this court shall certify to the official whose duty it is to cause the names of the candidates to be placed upon the ballots at the approaching election the result of the contest as finally determined in this court. Those provisions of the statute in question have been construed by this court in Price v. Russell, 154 Ky. 824, and Wheeler v. Patrick, 192 Ky. 362. In view of them and the opinions of this court construing them, we deem it proper to suggest as a queston of practice for the benefit of future litigants in this class of cases the advisability of considering, in case the trial court overrules the motion of either contestant or counter-contestant to count the ballots, whether or not they should bring the ballots themselves to this court for its consideration in

the event it concludes that the trial court was in error in refusing to receive them as evidence. In this record it appears that no motion was made either in the trial court or here to have the rejected ballots made a part of the record or to have the ballots produced to and opened and counted by this court as evidence herein. In Roby v. Croan, 177 Ky. 9, a contest for a nomination instituted and prosecuted under the section, *supra*, of the statutes, this court appears to have reversed the judgment and remanded the cause, with direction to the trial court to open and count the ballots upon the conclusion therein reached that the trial court erroneously had refused to do so upon the trial below. In that case, however, the peculiar statutory provisions relating to the jurisdiction of this court upon the appeal of that class of election contests do not seem to have been called to the attention of the court. Since the question is unnecessary to a determination of the rights of the parties on this appeal, we deem it improper to decide whether, in the absence of a motion either in the trial court or in this court to have the proffered and rejected ballots made a part of the record for the purposes of an appeal, we would be required to affirm the judgment of the trial court, though we might conclude that it had erroneously been adjudged that the evidence was not sufficient to establish the integrity of the ballots. We merely suggest the question for the benefit of future litigants in this field of controversy.

Relying upon Scholl v. Bell, 125 Ky. 750, which holds that if there is no official certificate of returns made by the officers of the election of the result of the election in a precinct, and if the ballots have not been properly preserved and can not be accepted as evidence as to how the vote was cast there, the result of the election at the precinct can not be established at all because parol proof is incompetent and results in the disfranchisement of the precinct, appellant contends that the vote of all eight of the precincts within the city of Mayfield should have been rejected herein by the trial court and no election declared. That argument is founded upon the trial court's conclusion that the evidence as to the preservation of the ballots was not sufficient to authorize them to be accepted as evidence as to how the vote was cast, and the fact that there were in existence at the time the evidence herein was taken no stub books and no official returns from any of the precincts of the city of Mayfield.

The fallacy of the argument lies in assuming that, because the evidence herein establishes that on Friday following the primary election on the preceding Saturday, when representatives for contestant sought to inspect the stub books from the various precincts of Graves county, it was ascertained that the eight stub books from the eight precincts of Mayfield, including the official returns from those precincts, had been stolen, that fact establishes also that there were no official certificates of returns from those eight precincts. The evidence herein establishes without contradiction that the officers of the election for those eight precincts made and signed and returned in due form official certificates of the returns of the election for their respective precincts, which as required by the statute were returned by them to the county court clerk. Those certificates were kept by the county court clerk until the convening of the county board of election commissioners to canvass the returns of the election from the county at large. They were then delivered to them and were duly canvassed by the county board of election commissioners and the official record of their canvass was duly entered upon their records. The stub books and the official certificate of returns from the eight precincts in question were then again delivered into the custody of the county court clerk as the law requires. It was thereafter that someone undisclosed by the record entered the place where they were stored and unlawfully carried them away. The facts of this case fall far short of the facts of the Scholl case, *supra*, wherein it was held that if there be no official returns from a precinct and the ballots have not been preserved so that they may be used as evidence the precinct necessarily must be disfranchised. The official returns from the precincts have served the full purpose for which they are required to be made in so far as they are a part of our system for determining who has been nominated or elected when they have been duly made and signed and returned to the county court clerk and have been kept and delivered by him to the county board of election commissioners and have been used by that board in convassing and certifying the results of the election. Thereafter they become merely part of the public records of the county and are open and accessible to everyone. To hold that if they thereafter be stolen or destroyed, if it also appear that the ballots have not been so preserved that they may be taken as evidence when an election is con-

tested must result in the disfranchisement of the precinct
would enable the entire vote of any political subdivision
to be rejected and the voters thereof disfranchised at the
will of any designing or fraudulent person. Appellant's
contention that the voters of the eight precincts of the
city of Mayfield should have been disfranchised for the
reason that the stub books and the official returns from
those precincts were stolen, under the facts of this case,
can not be sustained.

Section 1502, Kentucky Statutes, provides that in
cities and towns where registration is required the reg-
istration books shall be delivered to the officers of elec-
tion and that: "The officers of election shall, when a vote
is cast, mark opposite the name of the person voting,
in the column of the registration book provided for that
election, the word 'voted,' and at the close of the election,
and before closing or leaving the voting place, shall mark
opposite the name of each person who has not voted at
that election the words 'not voted.' "

It appears that the officers of election at precinct 1,
ward 2, of the city of Mayfield wholly failed to note on
the registration book of that precinct whether or not any
of the registered voters had voted. Appellant insists
that the requirement that that be done is mandatory;
that failure to do so rendered the entire election void at
the precinct in question; and that upon the trial hereof
contestee was entitled to be credited with none of the
votes certified as having been cast for him there. What
would follow if appellant's contention should be sus-
tained? A great number of legally qualified voters ex-
ercised the right of suffrage. They observed all of our
constitutional and statutory provisions which prescribe
how a legally qualified voter may vote in a legal manner.
The statute does not require that a voter must partici-
pate in any way in marking the registration book, or
charge him with the duty of seeing that it is done under
penalty of losing his vote. Hence legally qualified voters
would be disfranchised who observed all of the constitu-
tional and statutory provisions relating to who may par-
ticipate in an election and how one may vote in a legal
manner. That statement would seem sufficient to dem-
onstrate the erroneousness of appellant's contention.

The case is not analogous to the line of cases hold-
ing that an illiterate person or one physically incapable
of voting may not cast a legal ballot without first sub-

scribing to the oath required which authorizes officers of election to assist that class of voters in voting. The provision for aiding illiterate and physically incapacitated voters is in the nature of an exception to the constitutional and statutory provisions for secrecy of the ballot. Under the express provisions of section 1475, Kentucky Statutes, before that class of voters, though they be legally qualified to vote, may be aided in the manner provided the fact of illiteracy or incapacity to vote must be declared under oath. Until the oath is taken the voter stands in the general class and any departure from the manner of voting which destroys the secrecy of the ballot renders his vote illegal. The statute requiring officers of election to note on the registration book opposite the name of all of the registered voters of the precinct whether or not they voted at the election in question does not provide that failure to do so shall render the votes of those not so noted illegal. This court, in Anderson v. Winfree, 85 Ky. 597, quoted and approved the following from McCreary on Elections as the rule:

"The language of the statute to be construed must be consulted and followed. If the statute expressly declares any particular act to be essential to the validity of the election, or that its omission shall render the election void, all courts whose duty it is to enforce such statute must so hold, whether the particular act in question goes to the merits or affects the result of the election or not. Such a statute is imperative, and all considerations touching its policy or impolicy must be addressed to the legislature. But if, as in most cases, the statute simply provides that certain acts or things shall be done within a particular time, or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the actual merits of the election."

Directly in point, in Bates v. Crumbaugh, 114 Ky. 447, we said:

"There is good ground for recognizing a distinction between the obligations placed upon the individual voter and those matters which relate to the duties of election officers. Great care should be

taken to distinguish between those requirements designed to prevent fraud, and which are necessary to the purity of elections, and those which, while designed for the same purpose, are not essential thereto, or we may overreach the salutary effect sought to be obtained from provisions of the character first mentioned by going so far, in construing as valid and mandatory provisions of the second class, as to open the very door to fraud that was sought to be closed thereby. The individual voter may well be called upon to see that the requirements of the law applying to himself are complied with before casting his ballot; and, if he should willfully or carelessly violate the same, there would be no hardship or injustice in depriving him of his vote; but if, on the other hand, he should, in good faith, comply with the law upon his part, it would be a great hardship were he deprived of his ballot through some fault or mistake of an election officer in failing to comply with a provision of the law over which the voter had not control. It is also a question in which the public has a direct and important interest, for the loss of such vote may have a controlling effect upon a public matter.''

Measured by these tests we can not but conclude that the statute, *supra,* is directory and not mandatory. The trial court, therefore, did not err in refusing to reject the entire vote of precinct 1 of ward 2 because the officers of election failed to mark up the registration book.

Finally, appellant insists that the record discloses sufficient evidence of fraud and irregularities in the conduct of the election in Graves county, especially in the city of Mayfield, and particularly in precinct 2 of ward 1, to vitiate the election and require that the entire vote of those precincts be rejected. Aside from the fact that it appears that three unqualified voters were permitted to and did vote for contestee at precinct 1 of ward 2, there is no evidence of any description to be found in the record which in the least tends to establish that in any precinct of Graves county fraud, coercion, intimidation, bribery or illegal election practices were engaged in by the voters or any of them. The votes of the three illegal voters have been eliminated herein. It is shown that in ward 1, pricinct 2, the officers of election failed to note on

the registration book those of the registered voters who voted and those who did not. It is shown that in another precinct within the city of Mayfield the election officers marked on the registration book opposite the names of all of the registered voters of both political parties the word "voted," there being a total of 497 of them. However, the certificate of returns from that precinct certified that only 232 ballots were cast in the Democratic primary in the race for the congressional nomination, and the record affords no evidence that more than that number voted or that any of that portion of the 232 votes certified as having been received by contestee were cast by illegal voters or were cast in an illegal manner. Neither is there any evidence in the record tending to establish that in certifying the returns from that precinct the officers of election by fraud or mistake certified that contestant received more votes than were cast for him or that contestee received less votes than were cast for him. It appears that after the county board of election commissioners canvassed the returns the stub books of the eight precincts of Mayfield were stolen. There is nothing in the record to suggest that the certificate of returns from Pilot Oak precinct showing a total of 20 more votes received by the three candidates than the total number of ballots certified as having been cast was other than a mere mistake, probably made when whoever filled in the certificate of returns mistook the figures 79 on the tally sheet for 99, and copied them into the certificate of returns accordingly. So with the certificate of returns from Lynnville. Nothing suggested that it was any other than a mere mistake of even 10 votes made in hurriedly adding the tallies. The fact that at West Folsomdale the total number of votes certified as having been received by the three candidates was eight less than the total number of ballots certified as having been used does not even tend to establish a mistake. Frequently voters take ballots to the booth and return them to the officers of election without marking them for any candidate.

These and all of the other facts which need not be given particular attention, appearing in the record, urged by appellant as evidence of fraud, when given their greatest possible probative value could go no further than to establish fraud upon the part of the officers of election at precinct 1 of ward 2 in certifying that appellee

received more votes than were cast for him or than could have been cast for him by legal voters. If the officers of election at precinct 1 of ward 2 failed to mark up the registration book as part of a fraudulent plan upon their part to certify that contestee received more votes than were cast for him, and if the stub books subsequently were stolen to destroy the evidence of that fact; or if the officers of election fraudulently stuffed the ballot box at that precinct so that the ballots if opened would show that the number of votes certified as having been received for contestee were voted for him, and the stub books subsequently were stolen to destroy the evidence of that fact; all of that fraud, as we have herein above shown, may be eliminated without affecting the result. Appellant appears to have taken the deposition of every legally qualified voter of the precinct who did not vote, and by his evidence herein purged the registration book of the precinct of all those registered who had died or moved from the precinct before the election. Conceding him the utmost that he claims in these particulars the record establishes that only 94 votes which he did not receive or which may have been voted for him by voters who could not have legally participated in the election were certified by the officers of election as having been received by contestee. Nothing found herein tends in the least to establish that the election itself, the voters participating therein, and the manner in which they cast their votes were not unusually free from fraud, bribery, intimidation and illegal practices.

We have been pointed to and our investigation has disclosed no case in which the only evidence of fraud and illegal election practices could be carried no further than to establish fraud upon the part of the election officers in certifying their returns, all of which may be eliminated, where it was held that the qualified voters who voted legally should be disfranchised. Butler v. Robertson, 158 Ky. 101, contains an exhaustive review of our opinions dealing with fraud and illegal election practices and the rule for determining when they will vitiate an election. The opinions on the question and the rule established by them are thus stated in the Butler opinion:

"It will be observed running through all these opinions, that the court, while condemning fraud, violence, intimidation and bribery, has been careful to say that an election will not be set aside on ac-

count of the existence of either or all of these unlawful things in its conduct, if the votes influenced by one or all of them or the effect on the election generally or either one or all of them can be fairly eliminated and the result declared by casting up the votes legally polled and that were uninfluenced by these agencies. On the other hand, the court has been equally plain in saying that when the bribery, fraud, intimidation or violence has prevailed to such an extent as that its effect upon the result cannot be determined by any reasonable method of subtraction or elimination, the election should be declared void.''

Test this record by the rule uniformly applied and what is shown to be the result? Giving all the evidence of fraud the greatest possible probative value, all of the fraud and its effect on the election may be eliminated, and the result of the election may be ascertained from the votes that were cast untainted by the fraud. No good reason then exists why the legal voters who voted in a legal manner in the precincts in question should be disfranchised. Elimination of the votes tainted with fraud, as we have herein shown, does not change the result.

For the reasons herein indicated, the judgment of the trial court is affirmed.

The whole court sitting.