## Cline, et al. v. Cline, et al.

(Decided March 16, 1923.)

### Appeal from Pike Circuit Court.

1. Appeal and Error—Requirement of Dismissal is Mandatory Where no Transcript was Filed in Time.—The provision of Civil Code Practice, section 738, fixing the time for filing the transcript, is mandatory, and the appeal must be dismissed on motion made

by the opposite party in cases in which no transcript whatever has been filed.

2. Appeal and Error—Court has Discretion to Permit Additional Transcript After Expiration of Time for Filing Original.—Where an incomplete transcript was filed in good faith within the time required by statute, the Court of Appeals has discretion to permit the filing of an additional transcript to complete the record after the expiration of the period allowed by statute for filing the transcript, though it is better practice for appellant to move within that time for an extension of time to file the additional transcript.

3. Appeal and Error—Court of Appeals Ordinarily Will not Decide Issues of Fact on Affidavits.—A Court of Appeals is one of appellate jurisdiction, and, though it will consider affidavits filed on a motion to dismiss an appeal where there is no issue made as to the facts alleged it will ordinarily not investigate an issue of fact to determine the merits of such a motion.

4. Appeal and Error—Subsequent Agreement and Deed Without Consideration do not Prevent Revivor on Appeal of Action to Cancel Deed for Undue Influence.—Where deeds dividing a farm among the grantor's children were attacked for incapacity, fraud, and undue influence, the execution of a subsequent agreement by the grantors with some of the grantees for which there was no consideration, and of subsequent deeds confirming the prior conveyances, does not render the controversy moot so as to prevent a revivor on appeal after the death of the grantor, since the subsequent deeds would be tainted with the same defects as the original deeds.

5. Deeds—May be Canceled for Incapacity, Fraud, or Undue Influence.—Deeds dividing property among grantor's children should be canceled where the evidence as a whole tends to show that the grantor did not have sufficient mind to protect her rights or the rights of those in whom she was interested, or if she was misled and deceived as to the extent of the allotments made, or was persuaded to make a division of her property that she would not have made in the exercise of her own free will and judgment.

6. Deeds—Evidence Held to Show Incapacity or Undue Influence.— Evidence that a grantor intended by her deeds to divide her land equally among her children, giving two grandchildren their deceased mother's share, and that the deeds subsequently made by her gave one of the children a portion greatly less in value than the others received, and sold the interest intended for the grandchildren to another son for a price greatly less than its market value, held to show either that the grantor was incapable of making the division of the property she intended to make, or was unduly influenced by some of her children.

7. Estoppel—Acquiescence in Improvements Made With Knowledge of Grantor's Equities Does not Estop Attack on Deeds.—The fact that a grantor had permitted her grantees to make improvements

upon the properties conveyed to them does not estop the grantor or her heirs from attacking the deeds, where those improvements were made with full knowledge of the equities of the grantor and of the intention to bring an action to cancel the deeds, and there was some evidence they were made for the purpose of protecting the rights under the deed.

STRATTON & STEPHENSON for appellants.

HOBSON & HOBSON and PICKLESIMER & STEELE for appellees.

OPINION OF THE COURT BY JUDGE MOORMAN—Reversing.

In 1916 Martha Cline was the owner of more than a hundred acres of land in Pike county adjacent to the town of Pikeville. In the autumn of that year she received an injury which confined her to her bed for several weeks, and which her attending physician believed would probably result in her death. Acting on his advice, she requested one of her sons, who was a lawyer at Pikeville, to prepare a will or such other paper as might be advisable for the disposition of her estate. She had seven living children and two grandchildren, sons of a deceased daughter. It was decided—either on the advice of her son or in conformance with her own wishes—that she should divide her farm into eight equal parts and convey to each of her seven children and the two children of her deceased daughter one part. An engineer was employed to divide the farm and deeds were made to each of the seven children. Four of them accepted the deeds but the other three declined to accept the parts allotted to them because, as they claimed, the division was unequal. The part intended for the two grandchildren was sold by Martha Cline to J. S. Cline for $1,500.00, and the money deposited in a bank at Pikeville to be held for their benefit at her death. Shortly after the distribution was made Martha Cline instituted this suit in the Pike circuit court against J. S. Cline, W. O. B. Cline, Jacob P. Cline and Maude Cline Yost, the children who had accepted their deeds, for a cancellation of the deeds, alleging that she was weak, infirm, and incapable of understanding the consequences of her act at the time the deeds were made, that she was persuaded against her will to make them, that the division was not fairly made, and that none of the instruments was in fact her act or deed. The defendants resisted the suit, contesting the

grounds for cancellation set up in the petition and claiming that the grantor was estopped from asserting the invalidity of the deeds because she had stood by and seen some of the defendants improve the lands allotted to them by expending large sums of money thereon for which they could not be reimbursed if the deeds were cancelled. They also made the defense that the farm was not the property of Martha Cline, but in fact belonged to their father, P. A. Cline; and J. S. Cline interposed the further defense that he was the equitable owner of a one-half interest in the farm.

The two last mentioned defenses are not seriously pressed on this appeal, and we are convinced that the proof does not sustain them. The evidence is voluminous, relating in the main to the issues tendered in the petition and the defense of estoppel. A judgment upholding the deeds was rendered July 9, 1918, from which an appeal was granted but never perfected. In March, 1920, Martha Cline died. On May 19, 1920, an appeal was granted by the clerk of this court. On June 10, 1920, appellants A. D. Cline, the son of Martha Cline, and Perry Curnutte and Watt Curnutte, her grandchildren, by their statutory guardian, filed a petition in this court for a revivor. On December 14th a part of the record of the lower court was filed with the clerk of this court, but the remaining part of the record was not filed in this court until December 30, 1920, which was within twenty days of the first day of the second term next after the granting of the appeal. Appellees filed objection to the motion to revive and also motions to dismiss the appeal and to strike from the record that part of the transcript filed on December 30, 1920. These motions were passed to the hearing on the merits of the case.

The motion to strike from the record that part of the transcript filed on December 30, 1920, rests on section 738 of the Civil Code of Practice, which provides that "the appellant shall file the transcript in the office of the clerk of the Court of Appeals at least twenty days before the first day of the second term of said court next after the granting of the appeal, unless the court extend the time; as, for cause shown, the court may do." It is said that this provision is mandatory, and it is contended that the part of the transcript not filed within the time required should be stricken, which if done will effectuate an affirmance of the judgment, since, if the complete

transcript is not filed, the court must assume that the omitted part supports the judgment of the lower court. In a number of cases it has been held that if the transcript is not filed within the time allowed the appeal will be dismissed on motion made by the opposing party. The provision is mandatory in cases in which no transcript whatever has been filed. But it has also been decided that defects resulting from omission of the clerk, oversight of counsel, or a loss of the part of the record, may be supplied by an additional transcript, if the incomplete transcript has been filed in good faith and the ends of justice will be served by allowing the additional transcript to be filed. It is true that in that character of case the appellant should ask for an extension of time for the filing of the additional transcript, as provided by the Code. But if such additional time is not obtained, and an additional transcript is tendered after the time, this court may, in the exercise of its discretion, allow the additional transcript to be filed and consider it as a part of the record on the hearing of the case. In Bush, etc. v. Lisle, etc., 86 Ky. 504, after the expiration of the time allowed by the Code an additional transcript was filed in the clerk's office without asking an extension of time for that purpose, and it was held that a liberal construction of this provision of the Code should be indulged, and, when the partial record was completed before the case was submitted, this court would use its discretion as to whether it would consider the additional transcript, and in determining that question would be guided largely by the good faith of the appellant. The court said: "When submitted upon a defective or partial record, this court has held that it is then too late to amend it; but it has been the universal practice, when a transcript has been in good faith filed, and is defective or contains only a part of the proceedings below, to permit the filing of a supplemental record at any time before submission." It was pointed out in that opinion that the proper practice is to ask for an extension of time under section 738 of the Civil Code, and for failure to file a complete transcript the appellee may have the appeal dismissed if the time be not extended, but it was also held that when the appellant has attempted to perfect the record or is ready to perfect it when the motion to dismiss is made, the court may, in its discretion, allow the additional transcript to be filed. The facts in this case bring it within the discretion of the court, and, in view of the fact that the rights

of infants are involved, it is the opinion of the court that the amended transcript should be filed as a part of the record on this appeal.

The objection to a revivor raises the other preliminary question. Besides the four defendants in the original action, this objection is made by Roxie Cline, Preston and Ella Cline Richards, daughters of Martha Cline. In consequence, six of the seven children of Martha Cline concur in this objection, the opposing interests being represented by A. D. Cline and the two grandchildren of Martha Cline by a deceased daughter. Martha Cline died intestate. Whatever interest she then owned in any real estate passed to her seven children and her two grandchildren, the latter taking the interest that their mother would have taken had she been alive. In support of the objection appellees allege that Roxie Cline Preston and Ella Cline Richards have accepted deeds to the lands allotted to them in the division of 1916, and have conveyed the greater part of the property to innocent third parties. Appellees also file what purports to be an agreement executed by Martha Cline on November 25, 1918, by which she attempted to dismiss the appeal granted by the circuit court, agreed not to sue out an appeal in this court, and authorized her children to improve the lands she had conveyed to them. In addition, J. S. Cline files a deed of January 7, 1920, the consideration of which is one dollar in hand paid and other valuable considerations, by which Martha Cline confirmed the deed to the two-eighths interest in the farm that she conveyed to him in 1916. Appellees allege that on the faith of the agreement of November 25, 1918, they have constructed valuable buildings on the lands allotted to them, and for that reason they insist that the action should not be revived. Responses to these objections, putting in issue the statements filed in support of them and the verity of the agreement of November 25, 1918, and the deed of January 7, 1920, were filed by appellants.

This court is one of appellate jurisdiction, and, while it will consider affidavits filed on a motion to dismiss an appeal where there is no issue made as to the facts alleged, it will not ordinarily investigate an issue of fact for the purpose of determining the merits of such a motion. The motion in question may be judged by the rules that would apply if Martha Cline were the appellant and a motion were made to dismiss her appeal, for it must be conceded that appellants have no greater right to the

land in controversy than Martha Cline would have were she alive. Considered from that viewpoint, it is our opinion that the agreement of November 25, 1918, is ineffective, since it is without consideration. Moreover, if it be true that Martha Cline was subjected to influences that overpowered her will at the time the four deeds in controversy were executed and was then incapable of understanding the consequences of her acts—the very gist of this action—the agreement of November 25, 1918, is manifestly entitled to slight if any consideration in determining whether the action shall be revived and heard on its merits. To give verity to such a writing would enable one to escape the consequences of one wrongful act by committing another. And the courts will not establish precedents that open the door to that practice. For the same reason the deed of January 17, 1920, must be regarded as inefficacious, for indeed the issue in this case is whether Martha Cline was induced to execute a deed that she would not have signed had she not been overreached and her purposes perverted by overpowering influences. This court will not accept a deed nor an agreement, having no substantial consideration, as conclusive evidence of the settlement of a controversy involving a similar deed assailed on the ground that its execution was obtained by fraud. In view of these considerations, we conclude that the case should stand revived on the docket of this court in the name of A. D. Cline, Perry Curnutte and Watt Curnutte.

The issue tried in the court below was whether the four deeds in dispute were the voluntary acts of Martha Cline or were procured from her at a time when she was incapable of understanding the nature of the transactions and of properly appraising their consequences. If the evidence as a whole tends to show that she did not have sufficient mind to protect her rights or the rights of those in whom she was interested, or if she was misled and deceived as to the extent of the allotments, or was persuaded to make a division that she would not have made in the exercise of her own free will, the deeds should be cancelled. Wathens v. Skaggs, 161 Ky. 600; Herzogg v. Gipson, 170 Ky. 325; Lewis, et al. v. Lewis, et al., 194 Ky. 172.

Martha Cline was sixty-three years old at the time the division was made. Seven years before she had received a fall in which her hip bone had been fractured, resulting in a permanent lameness. A few weeks before

the deeds were made she sustained another injury to the same hip, and she was quite ill for several weeks as the result of that injury. She was confined to her room and her physician anticipated that the injury would probably prove fatal. With that in mind, he advised her to arrange for the disposition of her property at her death. She was a woman of strong likes and antipathies, and she does not seem to have been very discreet in her conversations in regard to those who had incurred her enmity. She was industrious and had assisted substantially in the accumulation of the money with which the farm adjacent to Pikeville was purchased. Her children were all grown. Some of them had become prosperous, others had been less successful. When she concluded to divide her farm, those of her children around her, or at least some of them, apparently became at once suspicious of the others. Most of them appeared to have in view only their own interest. Few if any of them were concerned with the welfare of their infant nephews. There were bickerings and suspicions and not infrequently abuse directed at the mother. The appellees say that she was then perfectly rational and such influence as she was subjected to, if not altruistic, was just. Moreover, they contend that the division was made according to her own plans and was fair, there being no material discrepancy in the values of the several allotments. They claim, however, that when this action was instituted she was under the domination of some of the children who were dissatisfied with the division, and that in fact it was not the real Martha Cline who instituted this action but a Martha Cline subservient to the will of malignant, discontented and grasping children. On the other hand, her testimony tends to show that she was incapable, at the time the division was made, of understanding what she did. For a part of that time she was taking opiates, although it does not appear that she was under the influence of opiates when the deeds were executed. There is evidence to show that one of her sons, upon whom she largely relied, exercised an undue and unreasonable influence over her at that time. There was constant complaint by one or another of her children about the division while she was trying to make it. She did her best to satisfy all of them and was evidently willing to do anything to avoid dissension. She was greatly distressed during the entire time. A personal altercation between the husband of one of her daughters and one of her sons,

relative to the division, threw her into a nervous spasm on one occasion. Finally the misunderstandings, criminations and recriminations led her to a change of purpose and to an attempt to retrace her steps, repossess herself of the deeds and destroy them. But for reasons variously stated in the record this was never accomplished.

The evidence, as we have said, is voluminous and contradictory. Certain pertinent facts, however, stand out as conclusively established. They are: First, that Martha Cline's sincere desire was to divide her property into eight equal parts, giving to each of her seven children one part and to her two grandchildren the part that would have belonged to their mother had she been living; second, that the part given to A. D. Cline was not nearly so valuable as that allotted to the other six children; and, third, that the part intended for the two grandchildren and later sold to J. S. Cline was of far greater value than the amount for which it was sold. These three facts are incontestably true and they are utterly irreconciliable. It is not claimed that the part originally intended for the grandchildren did not fairly represent one-eighth of the value of the farm. But it is said that the price for which it was sold to J. S. Cline was totally inadequate. The evidence on that point shows that thirty acres of the farm are level and the rest of it, consisting of approximately a hundred acres, is hill land. It appears, however, that some of the hill land is adaptable to residence sites. Practically all of the thirty acres is available for that purpose. There are few building sites in Pikeville or that vicinity, in fact this farm constitutes about the only land in or adjacent to Pikeville available for that purpose. It is conclusively shown, not only in the evidence for appellants but also in the cross-examination of witnesses introduced by appellees, that the level land itself is worth at least twenty-five or thirty thousand dollars. Much of the testimony is to the effect that it could be sold for considerably more than that amount. Besides, the hill land is worth several thousands of dollars. It is true that appellees introduced witnesses who testified that the land originally allotted to the infants was worth only a thousand or fifteen hundred dollars, but those valuations were based on agricultural uses, and practically every witness who fixed the value that low either disclaimed any knowledge of its value for building purposes or, on cross-examination,

made admissions showing a value far in excess of what was paid for it. On the whole it is convincingly shown that the land intended for the grandchildren was worth at least three or four times the amount paid for it. Again, the interest intended for A. D. Cline was shown to be less valuable than that given to the other children, and we may add that it does not appear that he sought to influence his mother in making the division, although he refused to accept the part allotted to him because he thought the allotment unjust.

If Martha Cline was capable of understanding what she did, it was her undoubted purpose to give to A. D. Cline and the two infant appellants a smaller share than to each of her other children. The alternative is that she was induced to make a division which she would not have made of her own free will. The latter explanation is alone consonant with her admitted desire to treat all the heirs alike. It is not to be thought—nor, indeed, assumed on the state of this record—that she intended to deprive the children of her deceased daughter of their patrimony, yet that is the effect of her act. It is not to be believed, in the face of her admitted purpose to make an equal division of her property, that she intended to give to her son, A. D. Cline, a smaller share than was given to her other children, but that is what she did. What, then, is the solution of her conduct? In our opinion it is that she acted under influences that deprived her of the power of carrying out a fixed intention to make an equal distribution of her estate.

But it is contended that appellants are estopped from asking a cancellation of the deeds because Martha Cline stood by and permitted some of appellees to make improvements on the lands allotted to them, and also because she ratified the deeds by a later conveyance and by authority given appellees to improve their respective properties. On that point it is enough to say that the same influence that induced the execution of the deeds in 1916 could have been responsible for her acquiescence in the improvements and brought about the attempts at ratification in 1918 and 1920; and here again her alleged acts were wholly inconsistent with her known purpose to make an equal distribution of her estate, which fact of itself indicates that the later acts were not performed of her own free will. But aside from that viewpoint, appellees were conversant with the circumstances in which the conveyances were made; they knew of the pendency of

this action, and there is some testimony tending to show that the improvements were hurriedly made with the view of making the conveyances more effective, if possible. However that may be, the conveyances were taken with full knowledge of the potential equities of appellants, and in those circumstances the making of the improvements will not operate to defeat their rights.

On the return of the case, judgment will be entered cancelling the four deeds in controversy. In the distribution of that part of Martha Cline's estate appellees will be credited with the expenditures made on the several lands conveyed to them and charged a reasonable rent for the use of the lands. She conveyed certain lots to several of her children prior to 1916, on which they erected buildings, and the cancellation of these deeds will not affect the title of those children to the lots previously conveyed to them.

For the reasons given the judgment is reversed and the cause remanded for further proceedings.